Filed 8/27/14  P. v. Esiquio CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS A. ESIQUIO,<br><br>    Defendant and Appellant. | B242389<br><br>(Los Angeles County<br>Super. Ct. No. SA074215) |

APPEAL from a judgment of the Superior Court of Los Angeles County.
Cynthia Rayvis, Judge.  Affirmed with modifications.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and
Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney
General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and
Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant Luis Esiquio appeals the judgment following his conviction for murder, attempted murder, and being a felon in possession of a firearm, contending the trial court erred in several respects. We reject his contentions, but find the court erred in failing to impose a mandatory $30 criminal conviction assessment for each count, so we modify the judgment to reflect the correct assessment. We affirm the judgment as modified.

## PROCEDURAL HISTORY

Following trial, a jury convicted appellant of murder (Pen. Code, § 187, subd. (a))[1]; attempted willful, deliberate, and premeditated murder (§§ 664/187, subd. (a)); and possession of a firearm by a felon with one prior, which the parties stipulated was a felony for vandalism (former § 12021, subd. (a)(1)). For the murder and attempted murder counts, the jury found true allegations that a principal personally and intentionally used and discharged a firearm, a shotgun, which proximately caused great bodily injury and death. (§ 12022.53, subds. (b)-(e).) For all counts, the jury found true allegations that the crimes were committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(C) & (b)(4).) The trial court sentenced appellant to a total prison term of 85 years to life, and imposed various fines, fees, and credits. Appellant timely appealed.

Codefendant Jose Tavares was tried alongside appellant before a separate jury. His jury deadlocked, and the trial court declared a mistrial.

## STATEMENT OF FACTS

Quincy Tillett, the murder victim, and Cesar Olmedo, the attempted murder victim, were members of the Hawthorne Little Watts gang.[2] Appellant was a member of the Inglewood 13 gang, a rival of Hawthorne Little Watts.

On March 6, 2010, around 10:00 p.m., Olmedo was attending a party on Kornblum Avenue in the City of Hawthorne. A fight broke out between six Hawthorne

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] Olmedo was in custody at the time of trial because he failed to appear to testify. He had been previously convicted of vandalism and possession of a firearm.

2

Little Watts gang members and about 11 members of the Inglewood 13 gang. The fight began after the Inglewood 13 members shouted out, "We're Inglewood," and the Hawthorne Little Watts gang members responded, "Little Watts." According to Olmedo, both he and appellant were part of the fight and he was "pretty sure" they fought each other. Olmedo did not see any guns or hear gunfire. When the fight ended, the Inglewood 13 members drove off in a gold Yukon or Explorer.

Tillett was not involved in the fight and only arrived at the party about 20 minutes later. At some point, he left to return his mother's car, and Olmedo followed him on his bike. Tillett retrieved his own bike and he and Olmedo met up and rode their bikes together back to the party. As Tillett rode in front of Olmedo, Olmedo noticed a brown or beige Honda or Toyota driving close to them in the same direction they were traveling. When the car reached Olmedo, he saw the person in the passenger seat, whom he identified as appellant, pull out a shotgun or long-barreled gun and fire. Olmedo jumped off his bike. Appellant fired again, hitting Tillett. Olmedo did not hear appellant claim his gang, which he viewed as cowardly in gang culture. Olmedo called 911 but left the scene before police arrived.

The shooting occurred between 11:00 p.m. and midnight about a half a block away from the party. Julio Cesar Rosas, a host of the party, was in a friend's house nearby when he heard someone shout, "Fuck Little Watts" and then heard gunshots. He went over to Tillett and observed him trying to breathe, and he told his friend's mother to call the police.

A Hawthorne police officer arrived at the scene at 11:35 p.m. and discovered Tillett having difficulty breathing. He interviewed nearby witnesses claiming their apartments had been struck by objects and found a screen door that had been struck by a projectile. A small pellet was recovered. Los Angeles County Sheriff's Department Detective Mitchell Robinson also arrived at the scene and recovered two cell phones, Tillett's clothing, a shotgun wad, a shotgun shell, some pellets, and a beer can. He observed a shotgun strike mark on the wooden fence nearby.

3

Appellant was arrested on March 13, 2010. At the time, a car near him contained two Inglewood 13 gang members, including one member named Anthony Castillo.

On March 18, 2010, Detective Robinson and a sergeant interviewed Olmedo, a portion of which was recorded and played for the jury. Olmedo was reluctant and uncooperative. Olmedo was not asked for and did not give a description of the shooter, but he stated before the recording began that the shooter was an Inglewood 13 gang member. He was shown a six-pack photographic lineup and immediately identified appellant as the shooter. He recognized him from the party, and he remembered him wearing the same white sweater at the party and at the shooting. Detective Robinson did not have Olmedo sign a form admonition for fear Olmedo would not cooperate, although he convinced Olmedo to initial his selection of appellant's photograph.

At the time, Detective Robinson was unaware that what he believed were moles or birthmarks on appellant's face near his eyes were actually tattoos. As part of the six-pack photographic lineup, Detective Robinson had selected two other individuals who had moles or birthmarks on their faces. Olmedo did not see tattoos on appellant's face during the shooting because the interior lights of the car were not on. Olmedo also told officers the shooter was not at the party, although he admitted at trial he lied about that.[3]

Adriana Leon, codefendant Tavares's girlfriend at the time of the shooting, testified at trial she knew appellant through Tavares and knew appellant's gang moniker was "Loco." She recalled attending the party with Tavares and his friends and recalled no one was armed, but during trial she claimed to remember very little of what happened because she was drunk. She testified she did not want to be at the trial and had no reason to be there.

She had given an interview to police on April 22, 2010, and a recording of the interview was played for the jury. She told police she attended the party with Tavares,

---

[3]     Olmedo testified he saw appellant twice while appellant was in custody. The first time appellant asked Olmedo why his name came up in appellant's case. The second time, which occurred the day before Olmedo testified, appellant told Olmedo he did not commit the crime, he loved Olmedo, and he would never want to hurt him.

4

appellant, two other Inglewood 13 gang members named Miguel Garcia and Anthony Castillo, and a girl named Janet. They arrived in a khaki-colored Tahoe belonging to Tavares's mother. She noticed gang members at the party, and appellant said, "Hey, where you from?" Someone responded, "Oh, this Hawthorne Little Watts [*sic*]." Appellant said, "Oh, this is Westside Inglewood Trece." Then they started fighting. Someone hit Leon and she hit them back. Tavares saw her get hit and started hitting the person who did it. Leon and her friend Janet ran to the car. The men in their group joined them and said they wanted to go back into the party. Leon told them not to, and Tavares agreed. Tavares dropped Leon and Janet at Castillo's house, and Tavares, appellant, Castillo, and Garcia drove away. They returned to Castillo's house about 10 minutes later, around 11:00 p.m.

At the preliminary hearing, Leon added some detail to the account she gave at her interview. She said the Hawthorne Little Watts group approached appellant, saying they were going to kill him, and Garcia defended him. She claimed the Hawthorne Little Watts called out their name, but her group did not respond; instead, members of Hawthorne Little Watts hit appellant. During the fight, Tavares told Leon to run to the car, and as she did, she was punched. At the time, she saw a gun pointed at her and a Hawthorne Little Watts member shot four or five shots at her and Janet, but she could not identify the shooter. She tried to hide in the car as she heard more gunshots. Leon's male companions entered the car without appellant, and drove around the block looking for him. They called him on his cell phone, and a few minutes later picked him up. At the time, his shirt was ripped and he was bleeding from his hand. He told everyone in the car that he had returned to the party and had gotten shot at. When Leon told appellant and the others she had been hit, they got angry and appellant and Castillo said no one should hit or shoot Leon because she was a girl. Castillo said they wanted to go back and beat "them" up. They dropped her and Janet off at Castillo's house and returned 20 minutes later.

Officers executed search warrants for several locations. At the residence of Daniel McEntee, an Inglewood 13 gang member with the moniker "Danny Boy" and a friend of

appellant, Tavares, and Castillo, officers recovered several guns, including an unloaded Mossberg pump-action shotgun; gang paraphernalia consisting of a jersey with "Inglewood" and "13" on the front and "13" on the back; envelopes containing letters from Inglewood 13 gang members in jail or prison, including one with appellant's name and address on it; a belt with an "I" on the buckle; and a cell phone containing three photographs of McEntee, appellant, and other gang members showing gang tattoos and displaying gang hand signals.

At Tavares's residence, officers recovered identification for Tavares and a cell phone with a screen saver showing a cartoon drawing of an Inglewood 13 gang sign. Officers also observed a gold GMC Yukon in the driveway, which they believed was similar to a car involved in the shooting. At appellant's residence, officers recovered 11 pieces of mail dated March 5, 2010, that bore appellant's name.

Parole compliance searches of the residences of Inglewood 13 gang members Raul Guillan and Yeshua Diaz yielded cell phones containing McEntee's moniker "D Boy" and "D Boi" listed next to the same phone number as the cell phone found in McEntee's residence. Appellant's moniker of "Loco" also appeared in the phone found in Diaz's residence next to the phone number attributed to appellant.

A forensic analysis of Tillett's body revealed he suffered a shotgun wound to the left side of his back, which caused his death. It was estimated the gun was fired one to three feet from him and the trajectory of the bullet was consistent with the shooter firing from a vehicle traveling on Tillett's left side and behind him. A forensic comparison of the Mossberg shotgun recovered at McEntee's residence and the shotgun shell, wad, and pellets recovered both at the scene and from Tillett's body revealed the shots came from that shotgun. The shotgun weighed five to seven pounds and it would be difficult to hold the gun steady while firing it with one hand and riding a bicycle (which was one possible defense theory). It could not be fired repeatedly while being held straight out.

During trial, the prosecution introduced evidence of cell phone calls made on the night of the shooting to and from numbers attributed to appellant, including two phone calls to the number attributed to McEntee, one made at 10:55 p.m. (before the shooting)

6

and one made at 11:47 p.m. (after the shooting). The calls reflected a pattern of travel from the area near the party to McEntee's house before the shooting, back to the area near the party at the time of the shooting, and then back to McEntee's house afterward.

The prosecution also presented evidence of nine contacts law enforcement made with appellant between January 2008 and February 2010, documented on field identification cards. During the contacts, appellant admitted he was a member of the Inglewood 13 Hyde Park clique, showed his gang tattoos, and gave the moniker "Moreno." During some contacts, he was with other Inglewood 13 members or affiliates, including Tavares on one occasion.

Detective Daniel Milchovich, the prosecution's gang expert, testified generally about joining a gang; gang culture; the use of monikers; gang hierarchy; the significance of reputation, respect, and fear; retaliation when a gang feels disrespected; the importance of territory; and use of hand signals and tattoos. He opined it was common for a gang member to have more than one moniker so a fictitious one can be given to law enforcement to avoid linking the gang member to a crime. With respect to hierarchy, there are usually nonmember affiliates, gang member "soldiers," and "original gangsters," or older tenured members who might decide discipline in the gang. Respect and reputation are important in gang culture and members will commit crimes to garner respect. The crimes instill fear in other gangs and in the community, which would allow gang members to commit crimes without law enforcement intervention. Once one gang disrespects another by, for example, entering rival territory, the disrespected gang can retaliate with assault and murder. Cooperating with law enforcement, or "snitching," is not condoned, and a "snitch" can be ostracized, beaten, or killed.

Detective Milchovich had extensive contacts with Inglewood 13 members and was familiar with the gang, which had been around since 1976 and currently had 300 to 350 members. He testified to the various cliques within the gang, and the clothing, tattoos, and hand signals associated with the gang. The gang's primary criminal activities included felony vandalism, graffiti, assaults, robberies, weapons violations, narcotic sales, murder, attempted murder, and shootings. Two gang members' convictions were

7

offered into evidence, one for assault with a deadly weapon with a gang enhancement, and one for shooting at an inhabited dwelling. One of the gang's rivals is Hawthorne Little Watts, and members of Inglewood 13 have committed other shootings against Hawthorne Little Watts members. The area where the shooting took place in this case was Hawthorne Little Watts territory.

Detective Milchovich had known appellant since 2008 and, based on appellant's tattoos, self-admissions, and association with other gang members, Detective Milchovich opined appellant was an active member of Inglewood 13 and had been since 2005 or 2006. He knew appellant went by the monikers "Moreno" and "Loco." He opined appellant and McEntee were good friends. Like Detective Robinson, Detective Milchovich did not know appellant had tattoos on his face until shortly before trial.

Detective Milchovich opined that Tavares was a close affiliate of Inglewood 13. He had numerous contacts with Tavares, including one contact two days after the shooting when Tavares and Castillo were stopped in a Honda four blocks from McEntee's house.

Given a hypothetical that tracked the facts of the case, Detective Milchovich opined the charges against appellant were committed for the benefit of Inglewood 13. By attending the party in a rival gang's territory and announcing their name, the Inglewood 13 members showed disrespect that prompted the Hawthorne Little Watts to announce themselves in response. That led to the fight and shooting, and when the Inglewood 13 members were forced to leave the area, they essentially lost the confrontation and would have been perceived as weaker than Hawthorne Little Watts. Returning with the shotgun and shooting at Tillett and Olmedo was an act of retaliation designed to regain respect after the fight. The shooting also reinforced fear in the community about reporting gang crimes.

In his defense, Tavares called Kelly Bautista, who testified in front of both juries that she heard gunshots while she was in her home. She looked out the window and saw a man on a bicycle with his face covered. She saw his hand pointed upward and two flashes of light coming out, but she did not see a gun. She saw a young man get

8

"thrown," but did not see Tillett's body until paramedics arrived. The shooter rode his bike away. She did not get a good view of the shooter, but described him as having a "medium" build. In a police interview, Bautista marked on a map where she saw the shooter riding his bike at the time of the shooting and drew an arrow in the direction of his retreat. But there was 130 or 140 feet between where she placed the shooter and where Tillett's body was found, and no casings or shells were found in the area Bautista saw the shooter fire his gun.

In his defense, appellant called an eyewitness identification expert, who testified to the low level of reliability of eyewitness identification and the factors that affect it, such as the resemblance among people, stress of the event, the passage of time between the event and the identification, and the identification procedure itself. Delay between the event and the identification can affect the witness's memory because the witness may have acquired more information in the interim and memory can change to support the identification made. Further, there is no correlation between confidence and accuracy, and the passage of time actually causes confidence to increase and accuracy to decrease.

In responding to a hypothetical mirroring the facts of this case, the expert opined the presence of a weapon and the death of someone close to a witness significantly lessens the accuracy of the identification of the shooter. Given a second hypothetical in which the witness did not give a physical description of the shooter, the expert opined that without a description there was no benchmark to compare against subsequent identifications, so those identifications would be based on the witness's assumptions of what he or she perceived.

With regard to photographic lineups, the expert testified the process should be double-blind, instructions should be clear, nothing unusual should appear in the photographs, and the session should be recorded. He opined that, when facial tattoos are present, the tattoos on the suspect should be covered and all other individuals in the lineup should be marked in the same area so no individual stands out. He believed appellant's facial tattoos should have been covered in the photographic lineup.

9

**DISCUSSION**

### A.  Gang Evidence

Appellant argues the trial court abused its discretion in admitting cumulative and prejudicial gang evidence of his nine contacts with police, the envelopes for five of the letters from gang members found in McEntee's house, and the three photographs found in the phone recovered from McEntee's house showing appellant, McEntee, and other gang members.  We disagree.

### 1.  Legal Standard

"Evidence Code section 352[4] provides the trial court discretion to exclude otherwise relevant evidence when its probative value is substantially outweighed by the probability that admitting the evidence will unduly prolong the proceeding, prejudice the opposing party, confuse the issues, or mislead the jury.  [Citation.]  'We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352.  [Citation.]  [For purposes of the statute,] "prejudicial" is not synonymous with "damaging," but refers instead to evidence that "'uniquely tends to evoke an emotional bias against defendant'" without regard to its relevance on material issues.  [Citations.]'  [Citation.]" (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 34-35.)

Gang evidence is relevant and admissible both to prove a gang enhancement under section 186.22, subdivision (b)[5] and to prove gang-related substantive offenses because "[e]vidence of the defendant's gang affiliation -- including evidence of the gang's

_____

**4**      Evidence Code section 352 states, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

**5**      Section 186.22, subdivision (b)(1) provides in relevant part, "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished" with an additional term of imprisonment.

10

territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like -- can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to the guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  In admitting gang evidence, the trial court must be mindful of the "risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged," but such evidence nevertheless remains admissible when relevant to prove identity or motive, if its probative value is not substantially outweighed by its prejudicial effect.  (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.)

### 2. *Procedural Background*

#### Gang Contacts

The prosecution presented testimony from six officers regarding nine contacts they had with appellant.  At sidebar during the first officer's testimony, appellant objected that the evidence was cumulative because appellant conceded he was a gang member and there was going to be other gang evidence.  The prosecutor disagreed, arguing the prosecution still had to prove appellant's gang membership beyond a reasonable doubt and she was trying to show a pattern of appellant's admissions of gang membership and his frequent association with other gang members.  The prosecutor assured the court she would not talk about the reasons appellant was stopped, if there were weapons, or anything of that nature.  The court implicitly overruled appellant's objection and allowed the testimony to go forward.

#### Gang Letters

During the testimony of the officer who conducted the search on McEntee's residence, the prosecution intended to introduce 16 letters from gang members found during the search, including one from appellant, arguing they were relevant to show McEntee was an Inglewood 13 gang member, he had contact with other gang members, and the letter from appellant created a connection between appellant and McEntee, which would show appellant went to pick up the shotgun from McEntee's house where it was eventually found.  The court suggested the letters were more prejudicial than probative,

11

and appellant objected that they were cumulative, highly prejudicial, not probative, and a waste of the jury's time because appellant's gang membership was not contested. The prosecution conceded the content of the letters was not relevant. The court excluded the letters but allowed five envelopes to be introduced and allowed the prosecution to say there were letters inside, the five senders were documented gang members, and they were found at McEntee's residence. The court denied the prosecution's request to say there was a "stack" of letters found because it was unnecessary in light of the gang-related jersey and photographs also found at McEntee's residence. Also, the court ruled that admitting any more than five would be misleading, confusing, and time consuming under Evidence Code section 352.

In front of the jury, the prosecution showed the five envelopes to the officer who conducted the search, who testified those were "some" of the letters recovered. Detective Milchovich also based his opinion of McEntee's gang status in part on those letters.

*Gang Photographs*

Prior to opening statements, appellant argued the prosecution failed to lay foundation for the three photographs found in McEntee's residence, which the prosecution intended to introduce depicting about 15 men with diagrams and boxes indicating their names and monikers. While appellant conceded the prosecution was permitted to introduce some evidence of gang membership and could introduce evidence of appellant's gang tattoos, he objected to overloading the jury with too much gang evidence. The prosecutor responded that, even though appellant conceded he was gang member, she still had to prove the gang allegations and the evidence was relevant to prove appellant's retaliatory motive and to show a connection between appellant and the shotgun found at McEntee's residence. The court admitted the photographs but ordered the names and monikers be redacted for opening statements.

During Detective Milchovich's testimony, appellant renewed his objection that the photographs with the names and monikers were unduly prejudicial, cumulative, and would consume too much time to lay foundation. The prosecutor reiterated the photographs and names were relevant to show the relationship between appellant and

12

McEntee, in addition to proving the gang allegation. The court overruled appellant's objection, finding the photos relevant to show appellant's involvement in the gang and they would not consume an undue amount of time. Detective Milchovich identified each gang member in the photographs and labeled them with their names and monikers. Appellant appeared in all three photos and McEntee appeared in two. One showed the gang members throwing gang hand signals.

### 3. Analysis

The trial court properly exercised its discretion in admitting the various items of gang evidence under Evidence Code section 352. All of the gang evidence was highly probative of appellant's membership in Inglewood 13 and corroborated Detective Milchovich's expert opinion that appellant committed the crimes for the benefit of the gang. The evidence was also relevant to prove the underlying crimes. During appellant's contacts with officers, he provided two phone numbers, and officers were able to obtain the cell phone records for those numbers to track appellant's movements the night of the shooting. Also, the field identification cards provided an evidentiary link to appellant's moniker of "Loco" because officers had not previously documented appellant's moniker as "Loco," but one of his documented phone numbers was the same as the number for the cell phone subscriber "Loco Loco." The five envelopes and the photos recovered from McEntee's residence showed appellant had a relationship with McEntee. That evidence, the evidence of the cell phone records tracking appellant's movements to and from McEntee's residence the night of the shooting, and the recovery of the shotgun at McEntee's residence, supported the prosecution's theory that appellant retrieved the shotgun from McEntee's residence and returned it after the shooting. And all the evidence tended to establish appellant's retaliatory motive and intent for the shooting.

The trial court also properly assessed the risk of unfair prejudice and undue consumption of time in admitting the evidence. While the prosecution may not have needed to introduce all nine contacts with appellant, the prosecutor assured the court she would not talk about the reason appellant was stopped or if any weapons were found, and she adhered to that assurance at trial. The testimony from the six officers regarding the

contacts also did not take an inordinate amount of trial time. For the letters, the trial court carefully limited the prosecution to five envelopes and excluded the letters entirely. And for the photos, there were only three of them and the trial court ordered the prosecution to remove the names and monikers during opening statements and only allowed Detective Milchovich to identify them during his testimony. Any remaining unfair prejudice was minimized by the trial court's instruction preventing the jury from "conclud[ing] from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime." We presume the jury followed the court's instructions. (*People v. Williams* (2009) 170 Cal.App.4th 587, 613 (*Williams*).)

Appellant relies on several cases to argue the court erred, but those cases are distinguishable. In *People v. Albarran* (2007) 149 Cal.App.4th 214, the court found the admission of gang evidence inflammatory and prejudicial because the trial court had dismissed the gang allegations following a new trial motion and the prosecution failed to present evidence the underlying crimes were gang-motivated, circumstances not present here. (*Id.* at pp. 227-228.) In *Williams*, the court found error but no prejudice from the prosecution's cumulative and repetitive evidence of at least eight crimes and several other incidents committed by other gang members. (*Williams, supra*, 170 Cal.App.4th at pp. 609-611.) The court was particularly concerned with the trial court's view that the prosecution could "over-prove" its case without regard to the burden on the court system and jurors. (*Id.* at pp. 610-611.) Here, the prosecution did not "over-prove" this case with unduly cumulative and repetitive evidence, but instead offered gang evidence specific to appellant to prove the gang allegations as well as appellant's identity, motive, and intent. Finally, in *United States v. Irvin* (7th Cir. 1996) 87 F.3d 860, the court found gang evidence offered to prove two defendants were members of the same gang and jointly possessed drugs with the intent to sell them was irrelevant because there was no evidence the underlying crimes were gang-related and was prejudicial because the gang insignias incorporated satanic imagery. (*Id.* at pp. 864-865.) Here, in contrast, there was significant evidence the crimes were gang-motivated and the gang evidence was relevant for other purposes. There was also nothing particularly inflammatory about the evidence.

14

### B.     Leon Interview

Appellant contends the trial court violated his due process and fair trial rights by playing Leon's recorded interview during trial and again during the jury's deliberations. We disagree.

#### 1.     Procedural Background

At trial, Leon acknowledged she was interviewed by police on April 22, 2010, and gave a statement. When asked what she remembered, she said she did not "remember much." The following exchange then took place:

"Q     But you gave a statement on April 22, 2010; right?

"A     Yes.

"Q     And in that statement, that statement was made about a month, month and a half after the party; right?

"A     Yes.

"Q     Okay.  And you were truthful in that statement?

"A     I should have been, yes.

"Q     Did you tell the cops the truth?

"A     Well, I was -- basically I just said what they wanted to hear.

"Q     Ms. Leon, did you tell them what you remember happening in March 2010?

"A     Well, yes.  Somewhat.  Because I told you, I don't remember much.

"Q     I'm asking you about on April 22nd.  I'm not asking you about today.  I'm asking you about on April 22nd, 2010, when you talked to them, did you give them your statement?

"A     Yes.

"Q     Okay.  Was it what happened at the party?

"A     Yes."

She was then asked if she went to the party with Tavares, and she responded she did.  She was asked who else was at the party, and she said Tavares's friends, three guys and a girl.  When asked their names, she stated, "I mean like I told you, I don't remember the names.  From what I read today morning, because I don't remember much, I guess I

15

said Luis, Jose, Anthony and Miguel." The trial court sustained defense counsel's objection and struck this response from the record. The prosecutor asked if listening to the recording of her police interview would refresh her recollection, and she said, "Well, I just told you the names of the guys." The prosecutor suggested playing it anyway. Appellant objected and the trial court refused to allow it to be played at that time.

The prosecutor asked Leon about her testimony at the preliminary hearing regarding the people who had gone with her to the party, and appellant objected. At sidebar, the prosecutor argued Leon's prior statement was admissible as past recollection recorded. Appellant argued the prosecutor had not laid a proper foundation for the statements to be admitted as past recollection recorded. The prosecutor disagreed, arguing Leon stated she had no independent recollection of her prior statements and she said listening to the recording would not refresh her recollection. The court expressed doubt Leon actually said that, and appellant claimed Leon had not testified that her prior statements were true. The prosecutor responded, "I asked her again did you tell everything that happened, and she said yes. After she said and went 'somewhat,' and I asked her another question because I knew it would be an issue."

Appellant cited Evidence Code section 1237 (past recollection recorded), arguing the audio recording was not a "writing" and Leon's statement did not satisfy the statute. The court disagreed but ruled that because the recording was not offered by an adverse party, the jury could hear the interview but it would not be admitted as evidence. The jury would also be given the transcript, but it would not have a copy in the jury room. The recording was then played for the jury. Leon acknowledged it was her voice on it.

During the course of Leon's cross-examination, the court found there was a "reasonable basis for believing that the forgetfulness expressed by the witness is feigned. The witness seems to remember everything that happened in March and again at the preliminary hearing in 2010. [¶] Her protestations about being under the influence at various times in her life rang pretty hollow to this Court. This Court had the benefit of observing the demeanor of the witness in court, and the Court finds it improbable that she

16

would not recall at age 19 being shot at a party in 2010.  [¶]  And her prior interview is properly admissible as an inconsistent statement."

Later, during a discussion of trial exhibits, the prosecutor indicated the recording of Leon's interview was not being admitted into evidence because the prosecution was not an adverse party.  The court agreed the interview was played for the jury but was not introduced.

During deliberations, Tavares's jury asked for Leon's interview, but the court declined the request because the recording was not in evidence.  Appellant's jury also asked for Leon's "full testimony," including her preliminary hearing testimony and the recording of her interview with officers.  The prosecutor argued Evidence Code section 1237 permitted the jury to hear the recording of the interview in open court even though the recording itself was not admitted into evidence.  Appellant disagreed, arguing the recording was not in evidence because it was not offered by the adverse party.  The court held the interview could be played for the jury but not admitted as evidence.

The issue arose again when the prosecutor requested the interview also be played for Tavares's jury.  Tavares's counsel objected and the court resisted playing it because Tavares's jury did not ask to have all of Leon's testimony reread.  The prosecutor argued Tavares's jury was entitled to hear the recording because it was still considered evidence even though it could not itself be admitted.  When the court agreed, appellant argued it was the same as if the jury asked to see something else not in evidence, which was not proper.  The prosecutor believed appellant was taking a "very narrow position" on the issue and if the jury needed to rehear the recording, it should rehear it.  The court indicated it would further consider the issue.

Later, the prosecutor reiterated the recording was testimony the jury heard via a recording, which should be treated like any other testimony.  Appellant believed the recording was not received as evidence and it was used to essentially refresh Leon's recollection, so it should not be replayed.  The trial court disagreed and maintained its prior ruling that the recording could be replayed.  It was played for the jury as part of the readback of Leon's testimony.  The next day, Tavares's jury requested the transcript of

17

Leon's interview be reread, and Tavares's counsel withdrew any objection to the readback. The court marked the recording for reference but did not admit it into evidence. Although his jury already heard the recording, appellant later filed a written motion asking the court to revisit the ruling reiterating his arguments. The court denied it.

### 2. Analysis

Appellant contends the recording of Leon's interview was improperly played for the jury both during trial and during deliberations because it did not satisfy the requirements for past recollection recorded, a prior inconsistent statement, or impeachment. Because we find it was properly admitted as past recollection recorded, we need not address the other grounds. (*People v. Cowan* (2010) 50 Cal.4th 401, 465 (*Cowan*).)

Evidence Code section 1237 states, "(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which: [¶] (1) Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory; [¶] (2) Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made; [¶] (3) Is offered after the witness testifies that the statement he made was a true statement of such fact; and [¶] (4) Is offered after the writing is authenticated as an accurate record of the statement. [¶] (b) The writing may be read into evidence, but the writing itself may not be received in evidence unless offered by an adverse party." An audio recording is considered a "writing." (Evid. Code, § 250.) We review the trial court's admission of evidence for abuse of discretion. (*Cowan, supra*, 50 Cal.4th at p. 462.)

Appellant argues Leon did not testify to a lack of recollection or testify her statements during the interview were true, so they did not qualify as a past recollection

18

recorded.  But the record belies his assertions.  Leon generally claimed she did not "remember much" from the night of the party and in response to most of the specific questions she was asked at trial, she testified she did not remember.  She therefore had "insufficient present recollection to enable [her] to testify fully and accurately."  (Evid. Code, § 1237, subd. (a); *Cowan, supra*, 50 Cal.4th at p. 465.)  Further, although she initially equivocated, she sufficiently testified her statements from the interview were true.  She also did not disavow any of the statements she made during the interview and was extensively cross-examined on her recollection.[6]

The trial court also did not abuse its discretion in allowing the recording of Leon's interview to be replayed for the jury during deliberations.  As the trial court correctly recognized, Evidence Code section 1237, subdivision (b) allows the writing to be "read into evidence" but could not itself be introduced because it was not offered by appellant, the adverse party.  When the recording was played for the jury during trial, it was effectively "read into evidence" and therefore became like any other testimony that could have been read back to the jury during deliberations.

## C.    *Confidential Informant*

Appellant asks us to review the transcript of the in camera proceedings related to his motion to quash and traverse the search warrant and for discovery and disclosure of the identity of any confidential informants to determine whether the trial court's denial of those motions was proper.

---

[6]    Appellant's citation of *Hodges v. Severns* (1962) 201 Cal.App.2d 99 is inapposite. That case arose under Code of Civil Procedure former section 2047, which allowed a witness to testify from a prior writing only if he or she retained "no recollection of the particular facts," whereas Evidence Code section 1237 requires that the witness merely retain "insufficient present recollection to enable him to testify fully and accurately." (*Hodges*, at p. 106, fn. 2.)  Moreover, in that case there was no showing the prior writing accurately produced the witness's original written notes. (*Id.* at p. 107.)  Here, by contrast, Leon acknowledged it was her voice on the recording and the interview set out the events she observed the night of the party.

We decline appellant's request with regard to his motion to quash and traverse because he did not have standing to bring that motion. A motion to quash and traverse a search warrant attacks the validity of the warrant. (*People v. Heslington* (2011) 195 Cal.App.4th 947, 957, fn. 7 ["A defendant moving to *quash* a warrant asserts the warrant on its face lacks probable cause," and "[a] defendant moving to *traverse* a warrant 'mount[s] a subfacial challenge, i.e., attack[s] the underlying veracity of statements made on the face of the search warrant application.'"]) Although the warrant here covered 16 different addresses, appellant's motion concerned the evidence found at McEntee's residence. Appellant has not attempted to demonstrate a privacy interest in that location, so he cannot challenge the validity of the search warrant. (*In re Rudy F.* (2004) 117 Cal.App.4th 1124, 1131-1132.) Indeed, the trial court denied his motion to suppress for that reason, although it did not recognize the same problem with the motion to quash and traverse.

With regard to appellant's motion to disclose, Evidence Code section 1041, subdivision (a) protects the identity of an informant when "'[d]isclosure of the identity of the informer is against the public interest because there is a necessity for preserving the confidentiality of [her] identity that outweighs the necessity for disclosure in the interest of justice. . . .'" (*People v. Hobbs* (1994) 7 Cal.4th 948, 960.) Nonetheless, "the prosecution must disclose the name of an informant who is a material witness in a criminal case or suffer dismissal of the charges against the defendant. [Citation.] An informant is a material witness if there appears, from the evidence presented, a reasonable possibility that he or she could give evidence on the issue of guilt that might exonerate the defendant. [Citation.] The defendant bears the burden of adducing "'"some evidence"'"" on this score." (*People v. Lawley* (2002) 27 Cal.4th 102, 159 (*Lawley*).) This standard does not mandate disclosure of a percipient witness unless the defendant "makes an adequate showing that the informant can give exculpatory evidence." (*Davis v. Superior Court* (2010) 186 Cal.App.4th 1272, 1277.) We review the trial court's denial of appellant's motion for abuse of discretion. (*Ibid.*)

Evidence Code section 1042, subdivision (d) sets forth the procedure when a defendant demands disclosure of an informant's identity as a material witness: "When, in any such criminal proceeding, a party demands disclosure of the identity of the informant on the ground the informant is a material witness on the issue of guilt, the court shall conduct a hearing at which all parties may present evidence on the issue of disclosure. Such hearing shall be conducted outside the presence of the jury, if any. During the hearing, if the privilege provided for in [Evidence Code] Section 1041 is claimed by a person authorized to do so or if a person who is authorized to claim such privilege refuses to answer any question on the ground that the answer would tend to disclose the identity of the informant, the prosecuting attorney may request that the court hold an in camera hearing. If such a request is made, the court shall hold such a hearing outside the presence of the defendant and his counsel. At the in camera hearing, the prosecutor may offer evidence which would tend to disclose or which discloses the identity of the informant to aid the court in its determination whether there is a reasonable possibility that nondisclosure might deprive the defendant of a fair trial. A reporter shall be present at the in camera hearing. Any transcription of the proceedings at the in camera hearing, as well as any physical evidence presented at the hearing, shall be ordered sealed by the court, and only a court may have access to its contents. The court shall not order disclosure, nor strike the testimony of the witness who invokes the privilege, nor dismiss the criminal proceeding, if the party offering the witness refuses to disclose the identity of the informant, unless, based upon the evidence presented at the hearing held in the presence of the defendant and his counsel and the evidence presented at the in camera hearing, the court concludes there is a reasonably possibility that nondisclosure might deprive the defendant of a fair trial."

As required by Evidence Code section 1042, subdivision (d), the court held an open hearing on appellant's motion. The court preliminarily found appellant failed to demonstrate there was a "reasonable possibility" the informant gave evidence on the issue of guilt which might result in appellant's exoneration. The court then held in camera proceedings, but it did not review the sealed portions of the search warrant in

21

camera for the purpose of the disclosure motion. Instead, the court noted at the outset of the in camera hearing that it had already found appellant failed to present a "substantial preliminary showing" for releasing the name of the informant. It then reviewed in camera the sealed portions of the warrant for the purpose of determining whether the sealed material supported appellant's motions to quash and traverse.

The trial court erred in not holding an in camera hearing on appellant's disclosure motion because appellant presented at least "some evidence" the informant or informants might have provided exonerating evidence. Appellant's theory of materiality was that Olmedo was purportedly the only percipient witness to the shooting, but by the time officers interviewed Olmedo almost two weeks after the shooting, they already knew to include appellant's picture in the six-pack photographic lineup they showed to Olmedo. From this, appellant infers one or more of the informants must have been percipient witnesses who provided information to officers implicating appellant in the shooting. This theory is certainly plausible -- there is no other explanation for how officers knew to place appellant's photograph in the lineup shown to Olmedo. Had the trial court held the in camera hearing prescribed by Evidence Code section 1042, subdivision (d), it would have been able to determine whether the informant or informants actually had any information that might have led to appellant's exoneration.

But any error was harmless. We have obtained and reviewed the sealed portions of the search warrant. If the trial court had conducted an in camera review, the court would have confirmed there was no reasonable possibility any informant, even a percipient witness, would have given evidence on the issue of appellant's guilt that might have exonerated him.

### D.    *Criminal Conviction Assessment*

For count 1, the court imposed a mandatory $30 criminal conviction assessment. (Gov. Code, § 70373, subd. (a)(1).) The court was also required but failed to impose $30 assessments for each of counts 2 and 3. (*People v. Sencion* (2012) 211 Cal.App.4th 480, 483-484.) Therefore, we will modify the judgment to reflect the proper criminal conviction assessment of $30 for each of counts 2 and 3.

## DISPOSITION

The judgment is modified to impose a $30 criminal conviction assessment for each of counts 2 and 3.  The trial court is ordered to issue an amended abstract of judgment reflecting the corrected criminal conviction assessment and forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

The judgment is affirmed as modified.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.